IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Denise Elaine Bone, ) | |
| ) | Civil Action No.  6:13-2698-BHH-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on May 24, 2011, alleging that she became unable to work on January 25, 2011. The application was denied initially and on reconsideration by the Social Security Administration. On April 5, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and John S. Wilson, an impartial vocational expert, appeared on July 10, 2012, considered the case *de novo* and, on July 27, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 10, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
>
> (2)     The claimant has not engaged in substantial gainful activity since the January 25, 2011, the alleged onset date (20 C.F.R § 404.1571 *et seq*).
>
> (3)     The claimant has the following severe impairments: rheumatoid arthritis, fibromyalgia, and asthma (20 C.F.R. § 404.1520(c)).
>
> (4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).
>
> (5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a). Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally, except that the claimant can never climb, crawl, and kneel. The claimant can perform frequent fine manipulation with both upper extremities and frequent gross handling bilaterally. The claimant can perform no overhead work and can have no exposure to temperature extremes or pulmonary irritants. She is limited to simple, repetitive, routine tasks.
>
> (6)     The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).
>
> (7)     The claimant was born on November 16, 1968, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. § 404.1563).

>  (8) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 1564).
>
>  (9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).
>
>  (10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. § 404.1569 and 494.1569(a)).
>
>  (11) The claimant was not been under a disability, as defined in the Social Security Act, from January 25, 2011, through the date of this decision (20 C..F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

### *Medical Evidence*

On December 2, 2010, the plaintiff presented to Georgia Roane, M.D., of Rheumatology Associates in Charleston, South Carolina with depression, poor sleep, and rheumatoid arthritis flare. On examination, Dr. Roane found that the plaintiff had synovitis in the left second and third metacarpophalangeal ("MCP") joints. The MCP and proximal interphalangeal joints ("PIP"), right ankle, and left shoulder were tender. Dr. Roane's impression was severe depression related to her father's recent death, mild rheumatoid arthritis with flaring, and scoliosis. The plaintiff was given a trial of Celexa and continued with Restoril, Prednisone, and Plaquenil (Tr. 251).

On December 20, 2010, Samuel H. Rosen, M.D., evaluated the plaintiff for depression and diagnosed major depression, single episode, moderate severity with symptoms suggestive of some post traumatic stress disorder and chronic pain. Lexapro was started (Tr. 247-48). On followup, the plaintiff reported decreased concentration, interest/motivation, sociability, and energy (Tr. 246).

The plaintiff returned to Dr. Roane on February 1, 2011. She was taking ten milligrams of Prednisone because she continued to have joint pain, especially in the right hand and wrists. On examination, her right hand was swollen through the third MCP region. Her right wrist was slightly swollen and tender. Her left wrist was mildly tender. Both shoulders were tender with abduction. Dr. Roane's diagnostic impression was rheumatoid arthritis, which remained active, and depression, which was coming under better control. Imuran was started. The plaintiff was continued on Plaquenil 400 milligrams a day and Restoril (Tr 250).

On March 23, 2011, the plaintiff continued to have pain in her hands and wrists, along with intermittent pain through the left jaw when chewing. Imuran was increased for active rheumatoid arthritis, and Prednisone was decreased (Tr. 249).

On June 22, 2011, the plaintiff continued to report she was achy and stiff, especially in the hands. Her hands, wrist, and shoulders were tender. Her ankles and knees were mildly tender. In addition, she had scattered trigger points (Tr. 270).

On September 22, 2011, the plaintiff presented to Dr. Roane with flaring of her rheumatoid arthritis. She was not doing well. She had tried to discontinue Prednisone but developed severe pain in the hands and wrists. She also had problems with sciatica, and the narcotic pain medications were causing significant itching. On exam, her hands were tender to the MCP joints, although there was little swelling. The wrists and shoulders were tender, with mild tenderness in the ankles and knees. She had scattered tender trigger points. Prednisone five milligrams was continued, along with Plaquenil, Imuran, and Restoril (Tr. 268-69).

On September 30, 2011, the plaintiff saw Temisan Etikerentse, M.D., of Hope Clinic in North Charleston, for a consultative examination. The plaintiff complained of pain in her hands, hips, knees, and shoulders, along with tenderness in the wrists. Her pain was worse with increased activity, and she had stiffness and pain in the morning. She described

difficulty showering, lifting above her shoulder, and carrying things. The plaintiff told Dr. Etikerentse that she was also having symptoms from scoliosis, which affected her because her hips were not the same height. She noted difficulty with lifting and stooping. She explained that she also had degenerative disk disease, had taken Lupron twice, and as a result had osteopenia. She had migraine headaches, depression, anxiety, and was diagnosed with post traumatic stress disorder, along with asthma and reactive airway disease. On exam, Dr. Etikerentse found that the plaintiff had some pain with full range of motion of her shoulders, more on the right compared to the left. She complained of pain in her hands, and he found swelling of the MCP joints in both hands. Her right small finger had ulnar deviation. She was unable to perform fine and gross movements with her hands. She also had some low back tenderness and pain and crepitus of both knees. Dr. Etikerentse's impression was rheumatoid arthritis. He noted she had begun to have joint deformities especially in the hands. She also had difficulty with gripping and twisting her hands, along with pain at the shoulder level, so she had problems with lifting above the shoulder or raising her hands above her head (Tr. 274-76).

On November 23, 2011, the plaintiff returned to Dr. Roane with a great deal of pain in her lower back, left wrist, and muscles everywhere. On examination, she was tender to the MCP joint, wrists, shoulders, ankles, and knees. The plaintiff was found to have scattered tender trigger points. Dr. Roane's assessments included rheumatoid arthritis, unspecified back ache, and fibromyalgia. Dr. Roane stated, "I think she is improving somewhat with the Humira, however, she still has a great deal of pain, and her findings are consistent with fibromyalgia" (Tr 291). The plaintiff received an injection in the right sacroiliac region for back pain, continued with five milligrams of Prednisone, and was given a trial of Savella for fibromyalgia (Tr. 292).

7

On January 24, 2012, the plaintiff presented to Keith Lackey, M.D., of Roper St. Francis in Charleston, for pain from a twisted right knee. She was started on Oxycontin and was to see Dr. Roane the next week (Tr. 283).

Dr. Roane noted at the next visit on January 31, 2012, that the plaintiff "is now on Oxycontin for pain management." She was feeling much better with the Humira. On examination, her hands were tender to the MCP joints, along with the wrists, shoulders, knees, and ankles. She had scattered tender trigger points (Tr. 289).

On March 26, 2012, William J. Estes, M.D., reviewed an MRI of the plaintiff's right knee. The exam revealed a full-thickness articular cartilage loss involving the medial facet of the patella and anterior portion of the lateral femoral condyle (Tr. 296).

On a followup visit to Dr. Lackey on April 24, 2012, he noted "right knee with full cartilage loss." The plaintiff had orthopedic followup scheduled. Dr. Lackey started her on Phentermine and refilled her Imitrex (Tr. 293).

On April 25, 2012, the plaintiff continued to report some stiffness to Dr. Roane, though the doctor noted she was not severely painful on that day. Her hands were tender to the MCP joints, along with the wrists, shoulder, ankles, and knees. She had scattered tender trigger points (Tr.298).

*Hearing Testimony*

The plaintiff confirmed that she was 43 years old, 5'2" tall, and weighed 174 pounds (Tr. 25). She was unmarried. She had a driver's license and was able to drive for short distances. She attempted to work once at a nursing job since her onset date of January 25, 2011, but was unable to complete more than two days of orientation for the job (Tr. 26). The plaintiff explained that she was unable to stand for long periods and had trouble bending, stooping, reaching above, and lifting (Tr. 26). She was currently receiving unemployment benefits and had applied for any kind of job she could - nursing, fast food, and desk jobs - without success.

The plaintiff told the ALJ she was unable to work because she was "in pain 24/7." She had rheumatoid arthritis, which caused pain in her hands, elbows, shoulders, back, neck, hips, and knees. She said she had some days when it was difficult just to get out of bed (Tr. 27). Trying to get ready took about four times longer than it used to. If she tried to walk any distance or do any kind of lifting, she wound up short of breath and needing a nebulizer or breathing treatment. She also had a recent knee injury, which caused pain because she had no cartilage in her right knee. She was told the doctors suspected the same condition in her left knee. This required her to wear a brace and to use a cane at times, which made it difficult for her walk and get around (Tr. 28). The plaintiff testified that she had a bulging disk in her back, along with scoliosis, which caused difficulty with bending, lifting, and stooping. She was unable to run or walk long distances any more or do any of the things she used to do.

The plaintiff testified that she took pain medications every four hours and muscle relaxers all day long (Tr. 28). This caused a problem with potential employers because the medicines caused drowsiness and forgetfulness. The plaintiff saw treating rheumatologist Dr. Roane every couple of months and her primary care physician, Dr. Lackey, as needed (Tr. 29). The plaintiff told the ALJ that her medications also caused side effects of jitteriness, weight gain, nervousness, anxiety, and shakiness, making her handwriting difficult to read (Tr. 29-30). She was also having some vision changes. The plaintiff stated that she was unable to function without her pain medication, which was Oxycodone, ten milligrams every four hours (Tr. 30). She had been taking narcotic pain medication for two or three years.

The plaintiff explained that she had been taking lower doses of pain medications, which enabled her to work until January of last year. All of her arthritis and pain medications had been increased because of increased swelling and pain (Tr. 31). The Humira from Dr. Roane had "helped some" (Tr. 31). The plaintiff said she could sit for

about 30 minutes before having to get up and change positions or she would have severe pain in her back, shoulders, hands, hips, and knees (Tr. 32). Standing was about the same. Her doctors had not given her specific limits on lifting, though they had recommended that she decrease the lifting. It was further decreased over time because of pain (Tr. 33).

The plaintiff stated that she could brush her teeth, feed herself, and use a pen if her hands were not swollen or when she had pain medicine (Tr. 33). She used a straw to drink because it was painful to use her hands for grasping (Tr. 34). A friend or her mother helped her as needed. While she used to be able to care for her personal needs, she now had difficulty taking a shower, drying her hair, or putting on makeup because of the pain in her hands (Tr. 35). She said her hands and arms hurt so badly that she would be in tears. She did not cook any more and rarely cleaned her house (Tr. 36).She spent her time sleeping, watching TV, and reading if she could. She did not go outside much and said she had not been out of the house more than twice in the past month (Tr. 36). She could use the computer "occasionally," but not for long periods of time (Tr. 37).

The plaintiff testified that she did take anti-depressant medications and Ativan for anxiety, which were originally prescribed by Dr. Rosen but now by Dr. Roane (Tr. 37).

The ALJ questioned why, with all her limitations, the plaintiff thought she was able to do any of the jobs for which she had applied. She responded that she did not necessarily think she could, but she was desperate because she had no income and needed expensive medications and treatment (Tr. 38).

*Vocational Expert Testimony*

The ALJ asked the vocational expert whether jobs existed for a person of the plaintiff's age, education, and work experience, who had the residual functional capacity ("RFC") to perform sedentary work, with the following additional limitations: could perform frequent fine manipulation and frequent gross manipulation; was unable to perform overhead work; could not be exposed to temperature extremes, high humidity, or pulmonary

irritants; and was limited to simple, repetitive tasks (Tr. 39-40). The vocational expert testified that such a person could not perform the plaintiff's past relevant work as a registered nurse (Tr. 40). The vocational expert testified that such a person could perform the jobs of a telephone quotation clerk, *Dictionary of Occupational Titles* ("*DOT*") 237.367-046; a surveillance system monitor, *DOT* # 379.367-010; and a weight inspector, *DOT* # 539.485-010 (Tr. 41). The ALJ then asked the vocational expert to consider a person with the same limitations outlined in the first hypothetical, except was restricted to occasional fine manipulation bilaterally (Tr. 41). The vocational expert testified that such a person could perform the job of weight inspector and ticket seller, *DOT* # 211.467-030 (Tr. 41). If the hypothetical individual required extraordinary breaks during the day, there would be no work consistent with that limitation (Tr. 42).

## **ANALYSIS**

The plaintiff was born on November 16, 1968, and she was 42 years old on her alleged disability onset date (January 25, 2011). She was 43 years old on the date of the ALJ's decision (July 10, 2012). The plaintiff has past relevant work as a registered nurse. The plaintiff argues that the ALJ erred by (1) failing to include all of her limitations in the use of her hands in the RFC assessment and (2) failing to properly evaluate her credibility.

The plaintiff specifically argues that the ALJ erroneously found that she was able to use her hands for frequent[2] fine and gross manipulation.

Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§

---

[2]The agency defines "frequent" as "one-third to two-thirds of the time." *See* SSR 83–10, 1983 WL 31251, at *6.

> 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1. The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Moreover, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, the ALJ found that the plaintiff could "perform frequent fine manipulation with both upper extremities and frequent gross handling bilaterally" (Tr. 15). In support of this finding, the ALJ noted (Tr. 16-17) that the plaintiff had "very good results" with Humira in controlling her rheumatoid arthritis and that, upon examination in March 2011, the pain in her hands and wrists was not as severe as it had been, and the joints in her hands were only mildly tender (Tr. 249). The ALJ further stated (Tr. 17) that in July 2011, only mild swelling was noted in the plaintiff's hands, and they were only mildly tender. The ALJ also acknowledged (Tr. 17) Dr. Etikerentse's consultative examination of the plaintiff in September 2011, in which Dr. Etikerentse noted swelling of the MCP joints in both of the

12

plaintiff's hands, ulnar deviation of her right small finger, her inability to perform fine and gross movements with her hands, that she had begun to have joint deformities especially in the hands, and that she also had difficulty with gripping and twisting her hands (Tr. 274-76). The ALJ also noted the opinions of the State agency medical consultants, who reviewed the record and found that the plaintiff could perform a range of light work (*see* Tr. 54-57, 69-72); the ALJ found that the opinions were "overly expansive in light of the objective medical evidence of record" but deserving of "some weight" (Tr. 17).

Based upon the foregoing cited evidence, the Commissioner argues that the ALJ's finding that the plaintiff could perform frequent fine manipulation with both upper extremities and frequent gross handling bilaterally was based upon substantial evidence (def. brief at 12-13). The undersigned disagrees. As noted by the plaintiff, "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions. . . . Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." SSR 96-9p, 1996 WL 374185, at *8 (emphasis in original). Dr. Roane, the plaintiff's rheumatologist, noted joint pain and tenderness in the hands and wrists from rheumatoid arthritis at every visit from December 2010 until the hearing (Tr. 251, 250, 249, 270, 268, 291, 289, 298). The plaintiff also had swelling in her hands on multiple visits (Tr. 251, 250, 274). Dr. Etikerentse's notes from the consultative examination show that the plaintiff had swelling of the MCP joints in both of her hands, ulnar deviation of her right small finger, and joint deformities. She was unable to perform fine and gross movements with her hands and also had difficulty with gripping and twisting her hands (Tr. 274-76). As noted above, the ALJ cited the evidence from Dr. Etikerentse's examination, but he did not explain how the evidence supported the manipulative limitations he found in the RFC assessment (Tr. 17). Moreover, both State

13

agency medical consultants found that the plaintiff should be limited to "occasional"[3] fine manipulation (Tr. 56, 71).  As discussed above, the ALJ found that these opinions were "overly expansive in light of the objective medical evidence of record" " as the consultants found that the plaintiff could perform a range of light work (Tr. 17).  The ALJ gave the opinions "some weight," but did not explain why he did not adopt the limitation to occasional fine manipulation (Tr. 17).  Based upon the foregoing, the undersigned finds that the portion of the RFC assessment finding that the plaintiff "can perform frequent fine manipulation with both upper extremities and frequent gross handling bilaterally" is not based upon substantial evidence. The undersigned recommends that, upon remand, the ALJ be instructed to explain why the plaintiff's reported symptom-related functional limitations and restrictions in the use of her hands can or cannot reasonably be accepted as consistent with the medical and other evidence. The ALJ should also be instructed to consider the plaintiff's remaining allegation of error concerning the evaluation of her credibility in making the RFC assessment.

The Commissioner argues that any error in the RFC assessment is harmless as one of the jobs the ALJ found the plaintiff could perform, a surveillance system monitor, *DOT #* 379.367-010, does not require handling, fingering, or feeling (def. brief at 13).  This court disagrees that such error is harmless as the ALJ did not include all of the plaintiff's impairments in the hypothetical question to the vocational expert.  "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) (citation omitted). Accordingly, upon remand, the ALJ should be instructed

---

[3]The agency defines "occasional" as "very little up to one-third of the time." SSR 83–10, 1983 WL 31251, at *5.

to reconsider the plaintiff's RFC as discussed above and to include all of the plaintiff's impairments in a hypothetical to the vocational expert.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>United States Magistrate Judge

December 5, 2014
Greenville, South Carolina